Filed 2/16/22  In re Morse CA4/1
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re WILLIAM JIM MORSE on<br><br>Habeas Corpus. | D077483<br><br>(Super. Ct. No. EMH-000347) |

Petition for Writ of Habeas Corpus.  Jeffrey Bruce Jones, Judge.  Petition granted.

Benjamin Salorio, Public Defender, Darren Bean, Deputy Public Defender for Petitioner.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Joy Utomi, Deputy Attorneys General, for Real Party in Interest.

On February 20, 2020, the El Centro District Attorney filed a petition to commit William Jim Morse as a sexually violent predator (SVP) under the Sexually Violent Predators Act (Welf. & Inst. Code,[1] § 6600 et seq.) (SVPA or the Act).  The petition was supported by the evaluations of psychologists

---

[1]     Statutory references are to the Welfare and Institutions Code unless otherwise specified.

Erick Fox and G. Preston Sims, in which the doctors concluded that Morse met the definition of a SVPA under the Act.

At the probable cause hearing, the People submitted two written psychological evaluations of Morse as the only evidence supporting probable cause. No live testimony was presented. Morse objected to the admission of the two psychological evaluations on the grounds they contained case specific hearsay that was inadmissible under *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), and the experts' opinions lacked proper foundation because they were based on inadmissible hearsay. The People countered that the evaluations were admissible under Evidence Code sections 721, 801, and 802.

Although the court sustained Morse's objection under *Sanchez*, it determined sufficient evidence in the two reports was admissible, leading the court to find there was probable cause that Morse is a person who meets the criteria of a SVP.[2]

Morse then filed a writ asking the superior court to reverse its finding under the SVPA that there is probable cause to believe he is likely to engage in sexually violent predatory behavior without treatment or custody. He argued that the court correctly found *Sanchez* applied at the probable cause hearing, and, after sustaining his hearsay objection to the experts' evaluations, there was insufficient evidence to support the court's probable cause finding. Morse also maintained that the People "waived" their right to assert section 6602 is an implied exception to the hearsay rule by failing to raise this specific ground at the hearing.

_____

[2] A " 'Sexually violent predator' means a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).)

In our original opinion, we concluded the superior court erred in sustaining Morse's hearsay objection at the section 6602 hearing. We found the SVPA as a whole, and section 6602 in particular, evince a legislative intent to allow a court to consider hearsay in the experts' evaluations when making a probable cause determination. As such, we concluded there was ample evidence in the record to support the court's probable cause finding. We therefore denied the writ petition.

Thereafter, the California Supreme Court granted Morse's petition for review and ultimately transferred the matter to this court with directions to vacate our prior opinion and reconsider the case in light of *Walker v. Superior Court* (2021) 12 Cal.5th 177 (*Walker*). Our previous opinion has been vacated, and as we explain *post*, in light of *Walker*, we grant Morse's petition and remand this matter back to the superior court with instructions to vacate its order finding probable cause under the SVPA and conduct a new probable cause hearing consistent with this opinion. We offer no opinion as to the result of that hearing but note that the court must follow *Walker* in determining whether probable cause exists.

OVERVIEW

Morse's challenge to the superior court's finding of probable cause under the SVPA focuses on the written evaluations prepared by Fox and Sims. In connection with their evaluations, the doctors reviewed Morse's background, criminal, prison, and mental health records, and records of the qualifying sexual offense. Morse refused to be interviewed by Fox. Thus, Fox completed his evaluation by relying on about 39 sets of documents, which he identified, including dates, in his evaluation.

Morse did agree to an interview with Sims, who also reviewed voluminous records identified in his evaluation. The doctors in their

3

evaluations concurred that Morse met the definition of a SVP as provided under the Act.

*Qualifying Sexually Violent Offense*

As described in the doctors' evaluations,[3] Morse's February 2012 Imperial County Probation Report (probation report) noted deputies, on January 24, 2010, responded to a physical altercation in a trailer park where Morse was then living. Deputies contacted Morse and discovered he had been hiding in the bedroom closet of seven-year-old[4] Jane Doe. Morse claimed while hiding he heard Jane Doe's 16-year-old cousin asking to be orally copulated by Jane Doe and saw him exposing his penis to his cousin. Morse further claimed he confronted the cousin and a fight ensued.

Deputies searched Morse's RV positioned adjacent to the victim's residence. Inside, the RV deputies found "images of child erotica, notebooks with handwritten text discussing child sex and an intention to engage in sex with children, literature discussing sex with children in foreign countries, and baby dolls with red paint on their vaginal areas."

According to the probation report, deputies, on February 10, 2010, interviewed Jane Doe's mother. She disclosed she had met Morse about two months earlier; he was the caretaker of the trailer park and an acquittance of her boyfriend. She also disclosed Morse had given her daughter "underwear and toys"; he had "frequently followed her daughter around"; and her daughter had reported Morse "touched or tickled her in the underwear area."

---

[3] The documents relied on by the evaluators are not included in the appellate record. We thus cite to the evaluations in summarizing the facts of Morse's qualifying sexual offense and the other information relied on by the experts in determining Morse met the criteria of an SVP.

[4] Fox in his report stated Jane Doe was seven years old, whereas Sims stated she was six years of age.

4

On February 23, Jane Doe was taken to the Chadwick's Children Center for a forensic interview. The probation report notes the following statements were then taken: "Jane Doe said she was watching Strawberry Shortcake when the defendant entered her room. He sat next to her on the bed and placed his hands on her upper/inner thigh. Jane Doe said she was scared and told her mother. On a separate occasion, Jane Doe said she was taking out the trash when the defendant began chasing after her. Jane Doe said she was very scared. Jane Doe further said that the defendant had given her a doll that had a hole on the 'private parts' area. On one occasion, he kissed the victim's doll on the vaginal area. The victim said the defendant repeatedly attempted to take her to the beach and had given her underwear and a Sea World towel. The victim lastly said that the defendant had attempted to kiss her. Jane Doe reiterated that she was afraid and did not like him at her house."

Although charged with multiple counts, Morse pled guilty to a single count of committing lewd acts upon Jane Doe, a child under the age of 14. (Pen. Code, § 288, subd. (a).) The court sentenced Morse to 12 years in prison.

*Fox's Evaluation*

Fox opined that Morse's conviction under Penal Code section 288, subdivision (a) qualified as "sexually violent offense" under section 6600,

5

subdivision (b).[5]  Fox also opined that Morse has a diagnosed mental disorder that predisposes him to the commission of criminal sexual acts.  (§ 6600, subd. (a)(1).)

With respect to his latter finding, Fox reviewed Morse's psychological history.  Fox noted there was limited information on this subject matter.  Fox cited to a Clearwater, Florida supplemental police report from 1995 in which Morse had been arrested for kidnapping and false imprisonment of a nine-year-old child.  Subsequent to his arrest, Morse's mother was interviewed by an investigating officer.  She stated Morse had a "long history of drug related problems" that led her to "kick" Morse out of the house on several occasions.

Fox also addressed Morse's educational, employment, relationship, and psychosexual history, as set out in the probation report.  This history shows Morse completed the ninth grade; served in the United States Army for three years;[6] and had at least four children.  Fox noted the probation report provided some background information regarding Morse, including about his father who died in combat while serving in the United States Army, and about his mother, who died in 2010.

Regarding Morse's psychosexual history, Fox noted there also was a dearth of information on this subject matter, particularly as a result of

---

[5]    As relevant here, a " 'sexually violent offense' means the following acts when committed by force, violence, duress, menace, fear of immediate and unlawful bodily injury on the victim or another person, or threatening to retaliate in the future against the victim or any other person, and that are committed on, before, or after the effective date of this article and result in a conviction or a finding of not guilty by reason of insanity, as defined in subdivision (a):  a felony violation of Section . . . 288 . . . of the Penal Code . . . ."  (§ 6600, subd. (b).)

[6]    Morse stated during his interview with Sims that he served one year in the Army and then left because his mother had health problems.

6

Morse's refusal to submit to a clinical interview. Fox noted the probation report provides evidence that in the qualifying crime Morse attempted to "groom" Jane Doe; that Jane Doe's mother was often intoxicated, making the victim "particularly vulnerable"; and that the Facts of Offense Sheet dated February 14, 2012 listed the titles of videos Morse had in his possession at the time of the qualifying crime. These titles included: " '6-9 years. Girls Fuck. Little Cunts. Fucked by big daddy. Rape little girl.' '5 mins. Russia. 7 yo Fucked by Daddy.' 'Hot little vaginas from Germany. 4-6 yrs—raped by 2 daddies.' Thailand-Bankok babes—pretens 5 yrs, 6yrs. Hot 8 yrs old getting pussy fucked by old dude.[ ] etc. . . ."

Fox described an incident from the probation report that took place after Morse had been arrested for the qualifying crime. An undercover agent from Immigration and Custom Enforcement was placed in Morse's Imperial County Jail cell because authorities were concerned by Morse's "intent to access child pornography and have sex with children in foreign countries." The agent befriended Morse; they had a number of conversations about child pornography and sex with children; and Morse agreed to purchase child pornography videos from the agent on Morse's release.

After making bail, Morse went to the agent's motel room to purchase the videos. The probation report, relied on by Fox, noted a hidden camera and microphone in the motel room recorded the following: " '. . . [T]he pornographic videos contained images of a "ten-year-old getting fucked by a dog," a five year-old "Brazilian bitch being raped by a man with a cock the size of fuckin [*sic*] Great Dane" and a little girl getting her "cherry popped." [The undercover agent] said he would sell the videos to him for $100. The defendant said $100 was a significant amount and that he needed a preview before purchasing them. He then told [the undercover agent] he

would purchase his toiletries from [a department store] in exchange for the videos. On February 1, 2012, he eventually paid [the undercover agent] $50 for the videos.'

"The defendant made several alarming statements such as . . . 'I fucked my own mother,' 'My daughter sucked my dick when she was like eight years old,' and 'I will protect fucking people that are like me. All my fucking life I knew I wasn't the only one, the only so-called fuckin molester or the only fuckin pervert.' The defendant added a pimp in Ciudad Juarez, Mexico had given him a child and that children commonly went for $400. [The undercover agent] suggested that they travel to Mexico to have sex with children. Enthused by the idea, the defendant invited himself and began to plan the trip. He said they needed to have a 'business plan.' The defendant said he was seeking more than sex and wanted a 'real relationship' with a[n] 11 year-old. Once he would 'fuck' her, nobody could touch her, he said. The defendant said he needed to give the children's mother[ ] money to calm down the children. Therefore, they drove to [a location] to access a [bank's] automatic [teller] machine; the defendant withdrew $800. Officers subsequently arrested him in the parking lot."

Fox noted Morse was accused of molesting another victim, who came forward on April 8, 2010. Fox's evaluation referenced an April 8 El Centro Police Department Narrative regarding this incident, which was summarized in the probation report. The probation report noted criminal charges from this incident, involving a six-year-old girl in which Morse was accused of molesting and grooming the victim, were dropped as part of Morse's guilty plea to the qualifying crime involving Jane Doe.

8

The probation report nonetheless provided details regarding this separate incident.[7] The victim reported to her father that Morse "touched her vagina, that his penis entered her vagina[ ] and that it hurt her. The victim confirmed it was Mr. Morse who molested her and remarked that he bought her toys. An El Centro Police Department Investigation Report dated 5-9-11 also indicates the victim stated Mr. Morse placed his mouth on her 'peepee' for a long time while inside Mr. Morse's recreational vehicle."

Fox noted that while Morse was incarcerated in 2011 at the Imperial County Regional Adult Detention Facility, deputies during a routine inspection found papers in Morse's cell that "contained writing and drawings that appeared to be of female children in various states of undress and provocative poses." Fox reviewed the drawings and reported one of the drawings "displays a female with her legs spread open and a caption of her saying, 'Fuck me hard daddy!' Underneath the image is the quote, 'Seems he has a daughter that just loves to fuck.' " Other writings on the papers included, " 'Little girls inside of blacked out minivans in Lost Angelles [*sic*] Cal. Arcade Fun.' "

In 2012, while in prison for the qualifying crime, deputies discovered a number of contraband pictures while searching Morse's bed area. Fox noted there were seven small pictures depicting "various dolls and very young girls who looked between the ages of 4 and 7."

Fox described an incident in 2015 when an inmate complained Morse was creating " '[d]isgusting drawings of children and cartoon characters showing their private parts.' " The source of the report is not given by Fox. Fox went on to note that shortly after the inmate complained, there was a

---

7    As discussed *post*, Sims questioned Morse about this incident during the forensic interview.

physical altercation between Morse and other inmates. Fox added, "I found no other mention of the child sexual material but given the history of such, it seems plausible Mr. Morse was creating it again."

Fox also addressed an incident in February 2019 when Morse walked across the prison yard "completely naked." Fox did not provide a source of this information. Fox in his evaluation noted Morse claimed to have done so for attention because he was fearful as a result of being a convicted sex offender.

Fox listed Morse's adult criminal history, which is extensive dating back to 1982, and includes Morse's 1995 conviction in Florida for false imprisonment of a nine-year-old child, as briefly noted *ante*. The criminal history also includes a section on Morse's "Institutional Behavior," which recounted more than 10 violations while Morse was incarcerated for the qualifying crime, including the February 2019 incident when Morse walked across the prison yard naked.

The evaluation also includes Morse's substance abuse, medical, and psychiatric history. Regarding the latter, among other details Fox stated, the probation report noted Morse admitted to being diagnosed with schizophrenia at the age of 10. According to Fox, Morse's medical records, including an IEX report dated March 4, 2019, "reveal Mr. Morse is diagnosed with a number of mental disorders including Bipolar Disorder, Antisocial Personality Disorder, and Pedophilic Disorder."

When Fox briefly met with Morse and attempted to conduct a forensic examination, Morse then was in custody in the Mental Health Crisis Bed level of care, which Fox opined was "similar to an acute inpatient psychiatric hospitalization." Shortly thereafter, Morse was transferred to an

"Intermediate Care Facility" because, Fox further opined, Morse needed a "higher level of care . . . than that which the prison can provide."

Fox reviewed Morse's Clinical Summary and Case Formulation dated August 21, 2019, which described Morse's psychiatric treatment history, most of which was from his incarceration for the qualifying offense. From this information, and other records summarized *ante*, Fox concluded that Morse "has not been stable psychiatrically for some time"; that he is "court ordered to take psychiatric medication involuntarily which highlights his lack of treatment compliance"; that Morse's antipsychotic medication therefore was being "administered intramuscularly"; and that he suffers from auditory hallucinations and paranoid thoughts, as also documented in progress notes from 2018 by the Mental Health Services Delivery System, where Morse again admitted to being schizophrenic.

Based on his review of these extensive records, Fox opined under the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5), that Morse's has the following diagnostic profile: "302.2 Pedophilic Disorder, Non-Exclusive Type, Sexually Attracted to Females"; "305.00 Alcohol Use Disorder, Mild"; "305.20 Cannabis Use Disorder, Mild"; "305.60 Stimulant Use Disorder, Cocaine, Mild"; and "298.8, Other Specified Schizophrenia Spectrum and Psychotic Disorder."

Regarding his diagnosis of pedophilic disorder, Fox noted the DSM-5 lists the criteria of this disorder as follows: "A. Over a period of at least six months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger). [¶] B. The individual has acted on these sexual urges, or the sexual urges or fantasies cause marked distress or

11

interpersonal difficulty.  [¶]  C. The individual is at least age 16 years and at least five years older than the child or children in Criterion A."

Fox opined that Morse met the above criteria, noting his prepubescent victims, including Jane Doe, were only six or seven years of age.  Fox continued, "The evidence shows he groomed each of these vulnerable children and had written about his desire to have sex [with] children.  Further evidence of his sexual interest in children is noted by officers who confiscated child pornography from his vehicle after his arrest in 2010.  Then, after detection for molesting the 7-year-old victim [Jane Doe], Mr. Morse befriended a cellmate who he later purchased child pornography from.  He then made arrangements to have sex with children in Mexico.  Mr. Morse also disclosed he had forced his 8-year-old daughter to orally copulate him.  The cellmate was actually an undercover agent.  Later in 2011, 2012, and 2015 while in custody, Mr. Morse was in possession of images and writings he created regarding sexual interest in children.  Consequently, the timeline for the disorder is met.  Mr. Morse has obviously acted upon his urges and the age requirements are established.  Mr. Morse's incarceration has caused him obvious marked distress and interpersonal difficulty.  The criteria for Pedophilic Disorder are met."  Fox then went on to address the remaining disorders discussed *ante*.

Fox opined Morse suffers from a "diagnosed mental disorder" as defined in subdivision (c)[8] of section 6600, as Fox found there was a "direct nexus between [Morse's] pedophilic disorder and his lack of volitional control."  Fox added:  "First, despite detection and sanction, Mr. Morse immediately sought

_____

[8]     " 'Diagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others."  (§ 6600, subd. (c).)

out child pornography to replace what had been confiscated. He then made plans and took steps to engage in sex with a child in Mexico. Thereafter, while incarcerated, he created images and writings to support his deviant sexual interests despite the fact that possession of such material imposed a significant danger to his safety. It is therefore clear his behavior is not deterred by actual consequences. In Mr. Morse's case, he is also emotionally impaired as a result of his pedophilic disorder. His statements and actions establish that he fails to recognize the significant psychological consequences to his victims."

Fox further opined that without appropriate treatment and custody, Morse was likely to engage in sexually violent criminal behavior as a result of his mental disorder. In reaching this conclusion, Fox relied on the Static-99R, scoring it "in the most conservative manner" by not including any incident involving a stranger or any male victims. Fox found Morse was in the above average risk category for being charged or convicted of another sexual offense. Fox's evaluation discussed at length absolute recidivism rates, as well as the structured risk assessment known as the violence risk scale—sexual offense version (VRS-SO), and a variety of dynamic factors under this assessment tool.

Fox went through 17 different factors relative to the VRS-SO. He found Morse's overall lifestyle is characterized by sexual deviance, including grooming at least two of his victims; possessing child pornography; discussing his sexual history with children with an undercover agent; acquiring more sexually deviant material from that agent; and making plans to travel abroad to have sex with children. Fox also found that Morse in 2010 planned his sexual crime, another factor, by grooming Jane Doe and the other young victim.

Other factors present in the VRS-SO included Morse suffers from some "cognitive distortions"; he "extensively or consistently" uses aggressive behaviors "in interpersonal interactions"; he lacks community support if released; if released, he will be at risk even on parole given his "thought disorder, poor medication compliance, substance abuse history, and limited resources"; he is unwilling to comply with community supervision, as he was on such supervision when he sexually assaulted Jane Doe, purchased child pornography, and made arrangements to have sex with children in Mexico; and he exhibits deviant sexual preference, as he showed a consistent and marked interest in children and was diagnosed with a paraphilia.

Fox found various case-specific factors also supported his conclusion that if untreated, Morse was likely to engage in sexually violent criminal behavior as a result of his mental disorder. Fox noted the depth and persistence of Morse's paraphilic disorder was "quite significant," as Morse's victims were vulnerable and he was willing to travel outside of the country to serve his sexual deviance. Fox thus found these factors set Morse apart "from the typical, average, or routine pedophile" who, according to Fox, tend not recidivate, unlike Morse who sought to do so while out on bail for the qualifying crime.

Fox next reviewed various factors that may mitigate the risk of sexual recidivism by Morse. Fox found none applied.

Fox also concluded Morse's qualifying crime was "predatory," as defined in section (e)[9] of section 6600. Fox noted Jane Doe was at most a casual acquaintance, and Morse only briefly knew his other victim. Fox further

---

[9] " 'Predatory' means an act is directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization." (§ 6600, subd. (e).)

noted both relationships were promoted for the primary purpose of sexual victimization. As such, he concluded any future sexual offenses committed by Morse were likely to be predatory in nature.

In addition, Fox discussed alternate sex offender treatment programs available to Morse. After assessing various factors, Fox concluded that if paroled, community-based voluntary treatment for Morse would be "insufficient." Fox therefore concluded Morse met the criteria of an SVP under section 6600, subdivision (a)(1).

*Sims's Evaluation*

Sims interviewed Morse for one hour and 20 minutes in connection with his November 5, 2019 evaluation. Sims also reviewed 41 sets of documents from the Department of State Hospitals (DSH); myriad rules violation reports from Morse's medical file generated by the R.J. Donovan Correction Facility; and Morse's mental health documents dated May 3 to October 30, 2019. Sims concurred with Fox that Morse's 2012 conviction involving Jane Doe, case No. JCF25010, was a "sexually violent offense" under section 6600, subdivision (b). Sims noted the case information showed Morse had been charged with five counts and he had pleaded guilty to count 1, with the remaining counts being dismissed under the plea.

Sims's evaluation, like Fox's, relied extensively on Morse's February 2012 probation report. Sims's factual summary of the qualifying sexual offense is thus similar to Fox's summary, described *ante*. Sims's evaluation, however, included additional information as follows: "On February 14, 2012, the undersigned (probation officer) interviewed the defendant at Imperial County Jail. Upon introducing myself, the defendant immediately asserted, 'I didn't do these crimes' and that he had pled to the instant offense since he had to two prior strikes. He added, 'I got railroaded

15

into taking a guilty plea.' The defendant said the incident report had numerous inconsistencies and he referred to police officers as 'dirty mother fuckers.' When asked to explain his relationship to the victim, he asked which one of the two victims. The defendant said he was a friend to both victims. When referring to Jane Doe, he said he cared for her when the mother was sick drunk [*sic*]. The defendant said he often had dinner at Jane Doe's house and would have a few beers with her mother. He said he was living with the other victim's mother, who was pregnant, and that he had helped care for her children. Later, he was accused of molesting her seven-year-old daughter. He denied engaging in sexual contact with either victim."

Sims during the clinical interview asked Morse about the incident involving Jane Doe. Morse responded he did not remember. When Sims reminded Morse he was sentenced to 12 years in state prison for this offense, Morse stated the incident was " 'erroneous,' " and added he had "[o]ral copulation with a Child Under 13 years."

During the interview, Morse also was asked about the incident involving the six-year-old girl, in which charges were brought then dropped in return for his guilty plea to the qualifying offense. Morse responded, "I was intoxicated and high on medication." When Sims questioned Morse about what effect the sex offense may have had on the little girl, Morse replied, "I doubt it. It was something she was used to."

Sims concurred with Fox that Morse's conviction under Penal Code section 288, subdivision (a) for the offense on Jane Doe met the definition of a "sexually violent offense" under section 6600, subdivision (b). Sims also concurred with Fox that Morse has a diagnosed mental disorder affecting his emotional or volitional capacity that predisposes him to the commission of

16

criminal sexual acts. Similar to Fox's evaluation, Sims reviewed Morse's background, educational, employment, relationship, and sexual history.

In the interview, Morse told Sims that both his parents were deceased; that he had three brothers; that he was physically and emotionally abused by his step-father from age 11 to 13; that he joined the Army when he was 18 years old but left after one year because his mother had health problems; that while in the Army he was sexually abused by two soldiers; and that also while in the military he was in a coma for 28 days after being "hit in the chest by a cannon shell."

After discussing his relationship history, in which Morse claimed he had five children living in Arizona and one in Ohio, all living with women other than the two he had previously been married to, he talked about his sexual history. When asked how often he thinks about children in a sexual way, Morse initially responded, "[O]nce in a blue moon. I don't know," then contradicted himself and said, "No." Morse also denied having any other type of "sexual problems" or "sexual deviancy."

Morse also discussed his alcohol and drug use during his interview with Sims. When asked if he had any problems with alcohol or drugs, Morse stated, "Currently, no. If I get out, I'll have to join a treatment program because I still have 'stinking thinking.' I can drink a 12-pack or smoke marijuana—it's legal, but I want to be more functional."

Sims also referenced the 1995 incident in Florida in which Morse was convicted of kidnapping. Sims wrote: "According to the police report, the defendant contacted a nine-year-old girl walking on the street (he reports he thought the girl victim was a boy) and coerced her to stay with him when she was to return home. When contacted by police, he lied and stated that 'he' was with him (the defendant). The child confirmed the lie. When the police

17

searched for them later, the defendant forced the child into a dumpster to avoid contact. They were found and the child was returned home the same day of the abduction."

Sims also discussed the qualifying crime. Sims noted after deputies contacted Morse on January 25, 2010, they searched his RV and found "[s]everal alarming items" that were "confiscated," as summarized *ante* in connection with Fox's evaluation.

Regarding the incident in the Imperial County Jail when authorities placed an undercover agent in Morse's jail cell, discussed *ante* in Fox's evaluation, Sims further noted the probation report described the following interview after Morse's arrest with respect to his purchase of child pornography from the agent: "[T]he defendant said that while in jail, he had met with [an individual allegedly named] Don Ramon, a man interested in child pornography and child sex. He said he wanted to entrap Don Ramon and thus posed as a pedophile. Since he wanted Don Ramon arrested, he purchased child pornography from him for $50. He further said he had led Don Ramon to believe that he would travel to Mexico in order to witness more of Ramon's criminal acts. In reference to the journals in his RV, he said he knew a few child molesters in Ocotillo and was planning to infiltrate by pretending to be one of them. The defendant denied having sex or sexual desires towards children. Agents made inquiries as to his initial arrest [on the qualifying crime]. The defendant said he was hiding from a biker in the child's room and [he] witnessed a 16-year-old attempt to molest a child. He said the child's mother was asleep, leaving the child unprotected in her bedroom."

Sims asked Morse about the incident involving "Don Ramon." Morse responded, "An undercover cop tried to sell me child porn. I told him, 'I don't

know you. I don't know what the DVDs are about, but I could use a ride to Ocotillo.' All they were trying to do was hook me on a case."

Morse during the forensic interview also made a "vague reference to another sex offense against a separate victim." Morse told Sims, "There is one they didn't indicate. It was nothing to do except me being drunk. . . . It was a friend I was babysitting. Her mom would get drunk. It was in Ocotillo, California."

Sims, as did Fox, also reviewed Morse's rule violation reports during Morse's incarceration on the qualifying offense. Sims asked Morse about an incident that occurred in February 2019, when Morse was arrested and taken to the mental health delivery system building after walking naked across the prison yard. Morse stated, "They wouldn't listen."

Sims reviewed Morse's extensive psychiatric history dating back to 1981. Although Morse claimed to have left the Army due to his mother's health, Sims noted while Morse was serving in the military he had a nervous breakdown and was discharged. Sims also noted that Morse in December 2002 was admitted to Patton State Hospital after being found incompetent to stand trial. The Discharge Summary dated February 23, 2005 relied on by Sims showed Morse previously had been diagnosed as schizophrenic. An August 20, 2010 Patton State Discharge Summary noted Morse attempted to "lure" one of his female peers into the mail bathroom, but was stopped by staff. He also was observed holding hands with female peers and "appeared to engage in many behaviors indicating he was looking for some erotic satisfaction on the unit."

Sims also included in his evaluation Mental Health Documentation dated October 26, 2019. Sims noted these records showed Morse had attempted suicide at least 10-plus times; and had experienced auditory

19

hallucinations, paranoia, disorganization, and mood swings. Sims also reviewed and summarized health records of Morse from R.J. Donovan Correctional Facility.

Sims asked Morse about his psychiatric history. Sims summarized their conversation as follows: "Mr. Morse stated that he had been hospitalized at Atascadero State Hospital 'a number of times.' He stated, 'I'm not schizoaffective. I think I'm schizophrenic. I don't have manic episodes.' He stated that he has auditory hallucinations 'at times.' He denied having paranoid thoughts. He stated that he currently takes lithium and valproic acid, but 'I don't notice a difference.' " Morse during the interview admitted several previous suicide attempts, "including breaking a razor off in his arm in 2016, drinking gasoline on the yard in 2016 and taking someone else's medications in a suicide attempt, also in 2016."

When asked to access his risk for sexual re-offense, Morse told Sims "zero." When asked why this was case, Morse replied, " 'because I'm going to get alcohol treatment. After 12 years of reflection, there's no way that I would do the same thing.' " Morse then denied needing any treatment for "sexual offense behavior."

Based on the foregoing, Sims diagnosed Morse using the DSM-5 as follows: "302.2 Pedophilic Disorder, Sexually Attracted to Females, Non-exclusive type"; "295.70 Schizoaffective Disorder, Depressive Type"; "303.90 Alcohol Use Disorder, Severe, in a controlled environment"; and "301.7 Antisocial Personality Disorder."

Sims used the same criteria from the DSM-5 used by Fox regarding the diagnosis of Pedophilic Disorder. Sims concluded Morse met the criteria, explaining: "Mr. Morse has been reported to view child pornography repeatedly, to engage in sexual activity with a 6-year-old and to make

20

comments regarding his sexual interest in children, such as 'My daughter sucked my dick when she was like eight years old,' and 'I will protect fucking people that are like me. All my fucking life I knew I wasn't the only one, the only so-called fucking molester or the only fucking pervert.'"

Sims found his diagnosis of Schizoaffective Disorder was warranted because Morse's "[p]ast symptoms have included auditory and visual hallucinations, bizarre delusions, paranoia, grandiosity, extensive mood swings with depression and mania, aggressive and assaultive behavior and extremely disorganized thinking." Sims also found support for this diagnosis because Morse previously had been diagnosed with schizophrenia, as he admitted during the interview, and because of his history of at least 10 suicide attempts.

Sims then reviewed the factors from the DSM-5 and Morse's history to diagnose him with Alcohol Use Disorder. Sims also used the criteria from the DSM-5 to explain his diagnosis of Antisocial Personality Disorder. Sims explained: "Mr. Morse's failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest . . . indicated in hi[s] approximately 31 arrests and approximately 20 convictions. His deceitfulness is indicated in his false imprisonment conviction, in his reporting the death of his mother on numerous occasions and in his report that he was posing as an FBI agent to entrap 'Don Ramon.' His impulsivity and failure to plan ahead is indicated in his alcohol abuse and parole and probation violations. His irritability and aggressiveness and reckless disregard for the safety of others was indicated in his arrests and convictions for Battery on Person, Assault with a Deadly Weapon, Attempted Murder, Child Cruelty and Lewd Act Upon Child. His consistent irresponsibility is indicated in his sporadic work history and failure to

21

support five children. His lack of remorse was clearly evident in the current interview."

Sims also concluded Morse has a mental disorder affecting his volitional and emotional control that predisposes him to the commission of criminal sexual acts. Sims based his conclusion on Morse's diagnoses of Pedophilic Disorder, Schizoaffective Disorder, Alcohol Use Disorder, and Antisocial Disorder which, when combined, produce such a condition. Sims found that this condition created a "volitional impairment" in light of the repetitive nature of Morse's sexual offenses, "despite the potential of being caught and sanctioned"; and that Morse repeatedly engaged in such sexual acts "despite the victims' discomfort/distress," evidencing the condition affected his emotional capacity. Sims thus opined Morse met the definition of "diagnosed mental disorder" under section 6600, subdivision (c).

Sims also opined that absent treatment or custody, Morse was likely to engage in sexually violent criminal behavior as a result of his diagnosed mental disorder. Sims found that Morse's scores based on the Static-99 and Static-2002 placed him in the average risk category for being charged or convicted of another sexual offense. Sims nonetheless found these scores did not include psychological risk factors, which, when considered, supported his finding Morse in the future was likely to engage in sexually violent criminal behavior.

Focusing on the factors of the structured risk assessment—forensic version, Sims found the factor for sexual preference for children applied to Morse, as Jane Doe was under 14 years of age, and Morse in the past has "expressed an interest in sexual activity with children in his statement [to] the undercover agent and his purchasing the alleged child pornography at that time." Other factors found present, or partially present by Sims

22

included Morse's sexual preoccupation beyond that considered "normal" for an adult; his emotional congruence with children; his callousness and lack of empathic connection with others; his grievance thinking based on poorly managed anger and a "persistent pattern of verbal aggression, angry outbursts, threatening and intimidating behavior"; his lifestyle impulsivity, demonstrated by his "sensation-seeking and poor tolerance for boredom"; his resistance to rules and supervision; and his dysfunctional coping.

Based on these factors, Sims opined that Morse's score on the structured risk assessment—forensic version, was 33, which "placed him at a 'high' level of psychological need."

Sims also considered protective risk factors. He found the risk of reoffense by Morse may be reduced as a result of Morse's chronic pain. However, Sims found other protective risk factors, such as completing a comprehensive sex offender treatment program or having been in the community without sexually reoffending, did not apply to Morse.

Sims also evaluated not only whether it was "likely" Morse would sexually reoffend, but also whether such an offense would be "predatory" in nature as defined in section 6600, subdivision (e). Sims opined that if Morse does sexually reoffend, it will likely be predatory given his offense against Jane Doe, who was merely a "casual acquaintance" with whom Morse had no substantial relationship.

Based on all of the foregoing, and despite Morse's Static-99R and Static-2002R scores, Sims concluded Morse "represents a substantial danger, that is, a serious and well-founded risk of committing a future violent sexual offense. Therefore, . . he is likely to engage in sexually violent predatory criminal behavior as a result of his diagnosed mental disorder without appropriate treatment and custody."

23

*SVP Petition, the Probable Cause Hearing, and the Writ Petition*

As noted, the El Centro District Attorney filed a petition in February 2020 to commit Morse as an SVP. The petition was supported by the evaluations of Fox and Sims, which were attached to the petition. In April 2020, the court held a probable cause hearing under section 6602. The People did not call any witnesses and submitted on the evaluations of the two doctors. Morse also did not call any witnesses.

Relying on *Sanchez* and *People v. Superior Court* (*Couthren*) (2019) 41 Cal.App.5th 1001 (*Couthren*), Morse objected to the evaluations on the ground they presented facts based on case-specific hearsay. Therefore, Morse argued the experts' opinions lacked proper foundation and the petition should be dismissed. The court sustained the objection but noted the objection was "somewhat vague, because, of course, the statements are spread throughout the report."

After sustaining the objection, the court took judicial notice of Morse's conviction for a violation of Penal Code section 288, subdivision (a) and noted that the crime involved a child under the age of 14, which qualifies the crime as a violent sexual offense. As such, the court found Morse had committed a qualifying offense as defined under section 6600, subdivision (b).

The court further noted:

> "[E]ven with the objection being sustained, there's sufficient evidence in the file to support the opinion that the qualifying crime was predatory in that even Mr. Morse was stating to the interviewer—and that's not hearsay at that level—that the child was a neighbor kid and that, you know, certain statements about the child's mother and her behavior and that sort of thing. So there's probable cause.
>
> "I'm not saying any further burden of proof than that. But there's probable cause to believe that it was predatory in

24

nature. Mr. Morse acknowledged to the interviewer that he did at least have schizophrenia.

"He doubted that he had schizoaffective disorder. But that's a mental disorder and, therefore, the interviewer or the author of the report [i.e., Sims], which was submitted [to the court] on April the 15th, had sufficient basis for the opinion that he suffers from a mental disorder that makes it likely that he will commit sexually violent acts in the future, at least as a probable cause standard."

On May 12, 2020, Morse filed a writ petition. The People on June 25 filed an informal response, and Morse on July 8 filed a reply to that response. On July 14, this court ordered the People to show cause why the relief sought in the petition should not be granted. The People responded by filing a return on August 6, and Morse filed a traverse on September 8.

DISCUSSION

As noted, Morse contends the court impermissibly relied on hearsay, including his interview statements to Sims and, despite sustaining his objection under *Sanchez*, to other case-specific facts in the evaluations in making its probable cause finding. Absent this inadmissible hearsay, he contends there is insufficient evidence to support the probable cause finding, and therefore, the petition must be dismissed.

When this case was first before us, there was a split in the Courts of Appeal whether an evaluation based on case-specific facts from hearsay sources is admissible at a section 6602 probable cause hearing to establish a person may be an SVP. (*Couthren*, *supra*, 41 Cal.App.5th 1001 [inadmissible]; *Bennett v. Superior Court* (2019) 39 Cal.App.5th 862 (*Bennett*) [same]; *Walker v. Superior Court* (2020) 51 Cal.App.5th 682 [admissible], review granted September 9, 2020, S263588.) Our high court has now weighed in and concluded that hearsay evidence regarding nonpredicate

25

criminal acts is inadmissible at a section 6602 probable cause hearing. (*Walker*, *supra*, 12 Cal.5th at p. 185.) Therefore, we must now consider Morse's petition in light of the Supreme Court's holding in *Walker*.

A. *Statutory Overview*

The SVPA "allows for the involuntary commitment of certain convicted sex offenders, whose diagnosed mental disorders make them likely to reoffend if released at the end of their prison terms." (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 235 (*Cooley*).) Before someone can be committed under the SVPA, the state must prove: (1) the person has previously been convicted of at least one qualifying "sexually violent offense" listed in section 6600, subdivision (b) (§ 6600, subd. (a)(1)); (2) the person has "a diagnosed mental disorder that makes the person a danger to the health and safety of others" (*ibid.*); (3) the mental disorder makes it likely the person will engage in future acts of sexually violent criminal behavior if released from custody (*ibid.*); and (4) those acts will be predatory in nature (*Cooley*, at p. 243).

Before the People may file a petition to commit a person as an SVP, the Department of Corrections and Rehabilitation (CDCR) must first screen him or her, generally at least six months before his or her scheduled release date. (§ 6601, subd. (a)(1).) "If as a result of this screening it is determined that the person is likely to be a sexually violent predator, the [CDCR] shall refer the person to the [DSH] for a full evaluation of whether the person meets the criteria in Section 6600." (§ 6601, subd. (b).)

Once a person is referred to DSH, he or she is evaluated under a standardized assessment protocol developed by DSH to determine whether he or she may be an SVP. The "standardized assessment protocol shall require assessment of diagnosable mental disorders, as well as various factors known

26

to be associated with the risk of reoffense among sex offenders.  Risk factors to be considered shall include criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder." (§ 6601, subd. (c).)

A person is initially evaluated by two mental health professionals designated by the DSH.  (§ 6601, subds. (c), (d).)  If both evaluators concur "that the person has a diagnosed mental disorder so that the person is likely to engage in acts of sexual violence without appropriate treatment and custody," the DSH forwards a request for a petition for civil commitment under section 6606 to the county in which the person was convicted of the offense for which he or she is currently incarcerated.  (§ 6601, subds. (d), (i).) "Copies of the evaluation reports and any other supporting documents shall be made available to the attorney . . . who may file a petition for commitment."  (§ 6601, subd. (h)(1).)  If the county's designated counsel concur with the recommendation of DSH, he or she "may file a petition for commitment in the superior court."  (§ 6601, subd. (h)(1).)

"Upon filing of the petition and a request for review under this section, a judge of the superior court shall review the petition and determine whether the petition states or contains sufficient facts that, if true, would constitute probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release.  If the judge determines that the petition, on its face, supports a finding of probable cause, the judge shall order that the person be detained in

27

a secure facility until a hearing can be completed pursuant to Section 6602." (§ 6601.5.)[10]

A person alleged to be an SVP is entitled to a probable cause hearing. (§ 6602, subd. (a).) The probable cause hearing is somewhat "analogous to a preliminary hearing in a criminal case; both serve to ' " 'weed out groundless or unsupported charges . . . and to relieve the accused of the degradation and expense of a . . . trial.' " ' [Citation.]" (*Cooley*, *supra*, 29 Cal.4th at p. 247.)

At the probable cause hearing, the court "shall review the petition and determine whether there is probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release." (§ 6602, subd. (a).) At the hearing, the individual is "entitled to assistance of counsel." (*Ibid.*) "If the judge determines there is not probable cause, he or she shall dismiss the petition and any person subject to parole shall report to parole. If the judge determines that there is probable cause, the judge shall order that the person remain in custody in a secure facility until a trial is completed . . . ." (*Ibid.*)

A trial is required "to determine whether the person is, by reason of a diagnosed mental disorder, a danger to the health and safety of others in that the person is likely to engage in acts of sexual violence upon his or her release from the jurisdiction of the [CDCR] or other secure facility." (§ 6602, subd. (a).) A person alleged to be a sexually violent predator is "entitled to a trial by jury, to the assistance of counsel, to the right to retain experts or

_____

10    "An order issued by a judge pursuant to Section 6601.5, finding that the petition, on its face, supports a finding of probable cause to believe that the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release, shall toll that person's parole pursuant to paragraph (4) of subdivision (a) of Section 3000 of the Penal Code, if that individual is determined to be a sexually violent predator." (§ 6601, subd. (j).)

professional persons to perform an examination on the person's behalf, and to have access to all relevant medical and psychological records and reports." (§ 6603, subd. (a).)  If neither the person deemed to be a sexually violent predator nor the attorney petitioning for commitment demand a jury trial, "the trial shall be before the court without a jury." (*Id.*, subd. (f).)  "A unanimous verdict shall be required in any trial." (*Id.*, subd. (g).)

"If the court or jury determines that the person is a sexually violent predator, the person shall be committed for an indeterminate term to the custody of the [DSH] for appropriate treatment and confinement in a secure facility." (§ 6604.)  Once a person has been found to be an SVP, the DSH must conduct annual mental health examinations, reporting to the court whether the person continues to meet the definition of an SVP. (§ 6604.9, subd. (a).)  The report to the court must recommend whether unconditional discharge or conditional release to a less restrictive alternative (that would adequately protect the community) is in the person's best interest. (*Id.*, subd. (b).)  If the DSH does not recommend either unconditional discharge or conditional release, a person may still petition for conditional release without the recommendation or concurrence of the DSH. (§ 6608, subd. (a).)

B. *Walker*

In *Walker, supra*, 12 Cal.5th 177, the California Supreme Court addressed what kind of evidence a trial court may consider in making its initial SVPA probable cause determination, specifically focusing on whether the trial court "can admit certain hearsay evidence in psychological evaluation reports in finding probable cause to commit individuals under the SVPA." (*Id.* at p. 185.)  The court answered that question in the negative, noting that section 6602, subdivision (a) does not create an exception that

29

allows hearsay regarding nonpredicate offenses to be introduced via evaluation reports. (*Walker*, at p. 185.)

The district attorney filed a petition to commit Walker as a sexually violent predator under the SVPA. The petition was supported by two reports written by psychologists Thomas MacSpeiden and Roger Karlsson. (*Walker, supra*, 12 Cal.5th at p. 186.) Both concluded that Walker satisfied the statutory criteria to be an SVP. (*Ibid.*)

In the reports, the psychologists discussed Walker's 1990 conviction for rape, a predicate sexually violent offense under the SVPA. (*Walker, supra*, 12 Cal.5th at p. 186; see § 6600, subd. (b).) They also discussed the alleged facts of two charged sex crimes that did not result in convictions qualifying as sexually violent offenses. In the first offense, Walker was charged in 1989 with raping a 16-year old victim. The trial court dismissed the rape charge before trial, but Walker was convicted of unwanted sexual intercourse with a minor. For the second offense, Walker was charged with rape in 2005. A jury acquitted Walker of this charge (apparently, the victim had lied), but it convicted him of pandering. (*Walker*, at p. 186.)

The psychologists obtained the details underlying the 1989 rape allegation from the 1991 probation report, and they obtained the details underlying the 2005 rape allegation from a police inspector's affidavit in support of an arrest warrant. MacSpeiden quoted the documents' description of events in his report. Moreover, the subject documents on which MacSpeiden relied summarized and quoted the victims' accounts of Walker's conduct and statements before, during, and after the alleged rapes. For his report, Karlsson quoted the police affidavit and summarized the probation report's description of events. (*Walker, supra*, 12 Cal.5th at p. 187.)

30

At the probable cause hearing, the prosecution moved to admit the psychologists' reports into evidence. Walker, however, objected, arguing the reports contained inadmissible hearsay regarding the 1989 and 2005 rape allegations. Per his objection, Walker asked the court to exclude the reports in the entirety or, in the alternative, to strike the portions of the report containing inadmissible hearsay. The court overruled the objection and admitted the reports into evidence. (*Walker*, *supra*, 12 Cal.5th at p. 188.)

Both MacSpeiden and Karlsson were cross-examined by Walker's attorney at the probable cause hearing. MacSpeiden admitted the 1989 and 2005 rape allegations "constituted key rationales for his evaluation." MacSpeiden specifically noted that "the two allegations and Walker's 1990 rape conviction all had 'essentially the same' 'modus operandi.' " (*Walker*, *supra*, 12 Cal.5th at p. 188.) As such, MacSpeiden explained that he believed it was important to describe the 1989 and 2005 rape allegations in his report, and he stated that he believed the allegations to be true and the documents describing the allegations to be reliable. (*Ibid*.) However, MacSpeiden contended that he would have still arrived at the same evaluation of Walker without the rape allegations because Walker had 11 sex offense charges between 1988 and 2007. That said, MacSpeiden did not include any of the factual details of those charges in his report except for the two rape allegations. (*Ibid*.)

During Karlsson's cross-examination, he "testified that his evaluation was informed by the 1989 and 2005 rape allegations. He explained that he relied on the probation report and police affidavit relaying these allegations because the documents were from sworn officers, and he therefore had no reason to believe the records had untrue information." (*Walker*, *supra*, 12 Cal.5th at p. 188.) Karlson also admitted that had he not consider the 1989

or 2005 rape allegation, his overall opinion about Walker could have been different.  (*Ibid.*)

In addition to cross-examining the two psychologists, Walker called four witnesses:  (1) the 2005 victim's ex-boyfriend, who testified that the victim admitted she falsely accused Walker of rape; (2) one of the initial psychologists who evaluated Walker and testified that he did not qualify as an SVP; (3) the police officer who investigated the 2005 rape allegation; and (4) Walker.  (*Walker*, *supra*, 12 Cal.5th at pp. 188-189.)  Based on the evidence produced at the hearing, the trial court determined that probable cause existed to commit Walker as an SVP.  (*Id.* at p. 189.)

Thereafter, Walker unsuccessfully sought to dismiss the petition, first, arguing that the psychologists' reports contained inadmissible hearsay in violation of *Sanchez, supra*, 63 Cal.4th 665, and second, asking the court to reconsider the denial of his motion to dismiss under *Bennett, supra*, 39 Cal.App.5th 862.  Walker then filed a petition for a writ of mandate in the Court of Appeal.  After issuing an order to show cause, the appellate court denied the petition, disagreeing with *Bennett* and *Couthren*.  (See *Walker v. Superior Court, supra*, 51 Cal.App.5th at pp. 694, 701-702, review granted.)  Our high court granted review to resolve the split.  (*Walker*, *supra*, 12 Cal.5th at p. 189.)

Yet, in granting review, the Supreme Court noted the limited scope of the question before it:  "the admissibility of *particular hearsay content* in the reports."  (*Walker*, *supra*, 12 Cal.5th at p. 193.)  Therefore, the court focused on "whether hearsay about nonpredicate offenses—otherwise inadmissible hearsay—may be admitted through expert reports under section 6602."  (*Ibid.*)

In determining the hearsay evidence was inadmissible at an SVPA probable cause hearing, the court noted, "Nothing in the language of the SVPA indicates the Legislature created an explicit hearsay exception to allow hearsay in evaluation reports, regarding an SVP candidate's prior nonqualifying offenses, to be admitted at a probable cause hearing." (*Walker*, *supra*, 12 Cal.5th at p. 195.)  Further, the court observed that the SVPA does not require consideration of the evaluation reports at the preliminary hearing stage, but instead, merely requires that the reports be prepared as a predicate to filing a petition under the SVPA.  (*Id*. at p. 196.)  And the court pointed out that the SVPA does not dictate how or even if the prosecution should present the reports to the court.  Alternatively stated, under the SVPA, the prosecution can determine the means of establishing the facts underlying the petition, which does not necessarily have to include offering the reports into evidence.  (*Ibid*.)

Our high court carefully reviewed and rejected the arguments advanced by the People to support the admissibility of the hearsay statements in the reports.  (See *Walker*, *supra*, 12 Cal.5th at pp. 200-206.) We need not repeat that discussion in depth here because we must follow the holding of *Walker*.  (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  That said, we note the court was clear that a trial court, under the SVPA, cannot allow the admission of hearsay in expert reports regarding facts associated with offenses that did not lead to the predicate conviction.  (*Walker*, at pp. 201, 206.)

The Supreme Court then determined that the admission of the hearsay statements from the psychologists' reports represented material error under the standard set forth in *Reilly v. Superior Court* (2013) 57 Cal.4th 641, 652-

33

656 (*Reilly*).)[11] (*Walker*, *supra*, 12 Cal.5th at p. 206.)  The court explained that some of the properly admitted evidence supported the existence of probable cause, but "some of the properly admitted evidence cut against the existence of probable cause." (*Id*. at p. 207.)  The court further observed: "Nothing in the record tells us exactly how the trial court settled on its probable cause determination by weighing the competing evidence.  But the nature and role of the inadmissible hearsay make it likely that this evidence prejudicially affected the trial court's determination." (*Ibid*.)  To this end, the court noted "the lurid hearsay details regarding the 1989 and 2005 rape allegations depicted Walker as an individual with a strong propensity and modus operandi for violent sex offenses." (*Ibid*.)  As such, the court could not "discount the possibility that the nature of rape allegation evidence impermissibly factored into the trial court's probable cause determination." (*Id*. at pp. 207-208.)  Moreover, the court found that the inadmissible hearsay that the trial court admitted "critically supported the evaluation reports' conclusions." (*Id*. at p. 208.)

The court observed that both MacSpeiden and Karlsson relied on and emphasized the inadmissible hearsay in their respective reports, specifically noting that Karlsson admitted during cross-examination that without consideration of the 1989 and 2005 rape allegations, his opinion might have been different. (*Walker*, *supra*, 12 Cal.5th at p. 209.)  Accordingly, the court determined that "without the inadmissible hearsay, the trial court would have lacked critical evidence to establish the diagnosis and reoffense

---

11    *Reilly* involved the issue of whether a sexually violent predator petition must be dismissed if the evaluations supporting the petition were conducted under an invalid assessment protocol.  Our high court concluded the defendant, as the party seeking mandate, bore the burden of showing the error "materially affect[ed] the outcome of his probable cause hearing." (*Reilly*, at p. 656.)

34

elements of the SVP determination. [Citations.] For that reason, and because of the inflammatory nature of the hearsay evidence, its admission prejudiced Walker." (*Ibid*., footnote omitted.)

C. *Application of Walker to the Instant Matter*

Per the direction of our high court, we apply *Walker*, *supra*, 12 Cal.5th 177 to the instant matter. As we explain *post*, in doing so, we conclude there was insufficient admissible evidence before the trial court on which to base its probable cause finding.

As a threshold matter, we observe several differences between the matter before us and *Walker* at the trial court level. In *Walker*, the trial court did not exclude any of the hearsay contained in the subject experts' reports. (*Walker*, *supra*, 12 Cal.5th at p. 188.) In contrast, here, the trial court sustained Morse's objection to the case specific hearsay contained in Fox's and Sims's reports. At the probable cause hearing in *Walker*, the two psychologists were cross-examined about the content of their reports, including the specific nonpredicate acts they considered and relied upon in reaching their conclusions. In addition, Walker offered his own witnesses who provided evidence against the prosecution's petition that probable cause existed that Walker was an SVP under the Act. (*Id*. at pp. 188-189.) In the instant matter, the prosecution relied entirely upon the two reports. Neither Fox nor Sims testified at the hearing. Accordingly, they were not subject to cross-examination. Moreover, Morse did not offer any affirmative evidence to challenge the SVPA petition. As such, the record in *Walker* regarding the probable cause hearing was much more developed than the one before us here.

Further, Walker's challenge in *Walker*, *supra*, 12 Cal.5th 177 was narrower than Morse's challenge here. There, Walker did not challenge the

admissibility of the reports or the admissibility of all the hearsay contained in those reports. Instead, Walker focused on the admissibility of hearsay about nonpredicate offenses under section 6602 at a probable cause hearing. (*Walker*, at p. 193.) In contrast, here, the scope of Morse's argument is much broader than Walker's. For example, Morse argues the court could not have admitted or relied upon statements Morse made to Sims (that are contained in Sims's report) as well as Sims's opinion that Morse had a disorder that made him likely to reoffend. Indeed, Morse argues that the only admissible evidence before the court related to his prior conviction of a qualifying offense under the SVPA. In this sense, Morse, unlike Walker, is challenging the admission of all hearsay contained in the experts' reports.

*Walker*, *supra*, 12 Cal.5th 177 does not directly address the arguments Morse offers here. Nevertheless, our high court makes clear that a trial court cannot consider hearsay evidence regarding nonpredicate offense. (*Id*. at p. 194.) Moreover, the court's reasoning in *Walker* strongly suggests that the rules of evidence apply at SVPA probable cause hearings and otherwise inadmissible hearsay does not become admissible under the SVPA simply because it is being offered at a probable cause hearing. (See *id*. at pp. 203-204 ["Without legislative guidance to the contrary, the same evidentiary rules, i.e., the Evidence Code, govern the probable cause hearing and trial"].) Thus, we acknowledge the approach of our previous opinion in this matter was incorrect. The SVPA does not allow the trial court to consider all the hearsay contained within an expert report. Instead, hearsay in an expert report must be admissible under an exception before a trial court may consider it.

Although *Walker* might not be on all fours with the instant matter, *Couthren*, *supra*, 41 Cal.App.5th 1001 is closer to the mark. In *Couthren*, like

here, at the SVPA probable cause hearing, the prosecution relied entirely on reports prepared by psychologists examining the defendant.[12] (*Id.* at p. 1006.) Defense counsel filed a motion in limine to exclude the expert reports on hearsay grounds under *Sanchez*, *supra*, 63 Cal.4th 665. No live testimony was presented; however, the prosecution offered certain additional conviction documentation regarding the defendant's prior offenses. (*Couthren*, at p. 1007.)

The trial court found admissible the portions of the expert reports discussing the details of the defendant's qualifying convictions as well as the additional conviction documents. Consequently, the court determined the prosecution sufficiently established the first element of proving the defendant was an SVP: the defendant had committed a qualifying sexually violent offense against at least one victim. Nevertheless, the court concluded the remaining elements necessary to prove the defendant was an SVP could not be established solely on the basis of hearsay written evaluations once defense counsel objected to the admissibility of these reports. (*Couthren*, *supra*, 41 Cal.App.5th at p. 1007.) The court therefore dismissed the petition. (*Ibid.*)

The prosecution then filed a petition for extraordinary relief. The Court of Appeal issued a temporary stay as well as an order to show cause. (*Couthren*, *supra*, 41 Cal.App.5th at p. 1007.) The appellate court ultimately agreed with the superior court, concluding that the SVPA did not contain any hearsay exception that allowed an expert's report to be admitted at a section 6602 probable cause hearing it its entirety. (*Couthren*, at pp. 1014-

---

[12] The prosecution submitted reports from three psychologists who concurred that the defendant should be considered an SVP. However, a fourth report was provided to the court "for its information" in which a fourth psychologist disagreed with the other three psychologists. (*Couthren*, at p. 1006.)

1015.)  As such, the appellate court concluded the superior court did not err in finding that there was insufficient admissible evidence before it to support a finding of probable cause.  (*Id.* at p. 1022.)

Here, like the prosecution in *Couthren*, the prosecution did not offer any live testimony and relied entirely on documentary evidence.  And, similar to the trial court in *Couthren*, the trial court in the instant matter excluded case specific hearsay contained in the reports.  Further, had the court here found the prosecution, by relying solely on the psychologists' report, did not show probable cause then its conclusion would fall squarely under the holding of *Couthren*.  However, the court did not do so.  It sustained Morse's objections "as to the case-specific statements" but concluded sufficient admissible evidence existed to support a finding of probable cause.  Thus, the issue before us is whether sufficient evidence exists, excluding the case specific hearsay, to support the trial court's finding of probable cause.

"[A] determination of probable cause by a superior court judge under the SVPA entails a decision *whether a reasonable person could entertain a strong suspicion that the offender is an SVP.*"  (*Cooley, supra,* 29 Cal.4th at p. 252.)  As we discuss *ante*, an SVP is defined in section 6600, subdivision (a)(1), as "a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior."  In addition, our high court held that the predatory nature of criminal acts is an additional element required to be proven at trial in order to commit an SVP.  (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1186.)  Thus, a court must find all these elements present to conclude probable cause exists under section 6602.  (See *Cooley*, at p. 250.)

In reviewing the trial court's finding of probable cause in this matter, we independently examine the court's resolution of mixed questions of law and fact and make sure the court's factual findings are supported by substantial evidence. (*Cooley*, *supra*, 29 Cal.4th at p. 257.)

Here, the only evidence before the trial court was contained in the two psychologist reports. Nevertheless, the court sustained Morse's objection to the case specific hearsay contained in those reports. Yet, in doing so, the court noted that Morse's objection was "somewhat vague" because the inadmissible hearsay statements were "spread throughout the report[s]." We agree with the trial court that the subject reports contain inadmissible case specific hearsay. Indeed, as we have described the content of the reports *ante*, they are replete with copious amounts of case specific hearsay on which the experts clearly relied and found reliable. Moreover, the reports themselves are hearsay. (See *Walker*, *supra*, 12 Cal.5th at p. 192 ["Documents like reports and records are generally hearsay if they are offered for their truth, and indeed, may contain further instances of hearsay, each of which is inadmissible unless also covered by an exception"]; *Couthren*, *supra*, 41 Cal.App.5th at p. 1010 ["We conclude that the rules of evidence apply in an SVP probable cause proceeding and therefore the admissibility of documentary evidence such as expert evaluations will be governed by the hearsay rule and any applicable exceptions"].) Thus, in finding probable cause based predominately on the reports, our task here is to determine whether the court's finding of probable cause is supported by substantial evidence consisting only of admissible evidence contained in the reports.

Below, the trial court took judicial notice of Morse's previous conviction for a violation of section 288, subdivision (a), which qualifies as a sexually violent offense. The court also noted that, "even with the objection being

39

sustained," "there's sufficient evidence in the file to support the opinion that the qualifying crime was predatory[.]" The evidence the court noted was Morse's statements to Sims "that the child was a neighbor kid and . . . certain statements about the child's mother and her behavior and that sort of thing." Moreover, the court determined that Morse's statements to Sims, which the court read in Sims's report, were "not hearsay at that level." Finally, the court found that Morse "acknowledged to" Sims that he had schizophrenia. However, the court noted there was some doubt regarding whether Morse had schizoaffective disorder. Nevertheless, the court reasoned: "But that's a mental disorder and, therefore, the interviewer or the author of the report . . . had sufficient basis for the opinion that he suffers from a mental disorder that makes it likely he will commit sexually violent acts in the future[.]"

Morse does not challenge the court's finding that he committed a qualifying crime. That said, he argues there was no other admissible evidence before the court to satisfy the remaining three elements required to find he fit the definition of an SVP for purposes of the probable cause hearing. To this end, he argues the court considered what he said to Sims, but Sims did not testify at trial. Therefore, the court considered what Sims's report repeated what Morse had said, which is inadmissible hearsay. We agree, and the court sustained Morse's objection to the case specific hearsay contained in the report. Thus, the court could not consider Sims's report's recounting of Morse's statements unless that recounting was admissible.

The People imply that Morse's statements were admissible under either section 6600, subdivision (a)(3) or the party admission exception under Evidence Code section 1220. We reject both these contentions. The California Supreme Court made clear that the hearsay exception contained in

40

section 6600, subdivision (a)(3) only "permits the prosecution to show the existence of and details underlying the first element of the SVP determination—a predicate sex-offense conviction—'by documentary evidence, including but not limited to, preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations[.]' " (*Walker*, *supra*, 12 Cal.5th at p. 198.) Accordingly, the court has "interpreted the provision as allowing the prosecution to prove facts of a defendant's prior qualifying convictions not just with certain documents (like evaluations) but also with multiple-level-hearsay statements contained therein (like police and probation reports, and victim statements they include)." (*Ibid*.) Thus, section 6600, subdivision (a)(3) does not provide an avenue to admit otherwise inadmissible hearsay at an SVPA probable cause hearing to prove anything beyond a qualifying offense.

In addition, the party admission hearsay exception does not make Morse's statements repeated in Sims's report admissible. Hearsay consists of an out-of-court statement made by someone other than a testifying witness offered to prove the truth of the matter stated and is generally inadmissible unless it falls under an exception. (Evid. Code, § 1200, subds. (a), (b); see *Sanchez*, *supra*, 63 Cal.4th at p. 674.) Morse's statements to Sims are hearsay but could be admitted under the party admission exception. (See Evid. Code, § 1220.) Nonetheless, here, the issue is not just the admission of Morse's statements to Sims. Sims did not testify at trial about what Morse told him. Instead, Sims's report contains Morse's statements to Sims. The report's mention of Morse's out of court statements are being offered for the truth of the matter asserted and, as such, are hearsay. Multiple hearsay, or hearsay-within-hearsay, is admissible only when each level of hearsay "meets the requirements of an exception to the hearsay rule." (Evid. Code, § 1201;

41

see *Sanchez*, at p. 675.) Thus, for the portion of the report containing Morse's statements to Sims to be admissible, a hearsay exception must not only apply to Morse's actual statements but the report containing those statements.

Because the People submitted their return before *Walker*, *supra*, 12 Cal.5th 177 was decided, they argue that section 6602 creates a hearsay exception that allows a trial court to consider all the hearsay contained in an expert's report for purpose of determining whether probable cause exists. As our high court explained in *Walker*, no such exception exists in the SVPA.

Consequently, we agree with Morse that the statements the trial court identified as supporting its finding that probable cause exists are hearsay that are not subject to any exception. As such, the court could not rely on that evidence to support its finding of probable cause. Although there may be admissible evidence in the two expert reports that support the trial court's finding of probable cause, neither party has identified it here. Morse argues that the reports are inadmissible hearsay under *Couthren*, *supra*, 41 Cal.5th 1001, and thus, there was no admissible evidence before the court except for evidence establishing he committed a qualifying crime under the SVPA. The People do not point to any other admissible evidence. Instead, they rely on the same statements from Morse on which the trial court relied and which we determined were inadmissible.

Based upon the limited record before us, we believe the most prudent course is to grant the requested relief and remand this matter to the superior court with instructions that it conduct a probable cause hearing that complies with the dictates of *Walker*, *supra*, 12 Cal.5th 177 and *Couthren*, *supra*, 41 Cal.App.5th 1001. Such an approach is especially appropriate where the only evidence presented at the probable cause hearing consisted of two expert reports that contain abundant inadmissible hearsay, which is inflammatory,

42

and there is no indication in the record regarding on what admissible evidence the trial court relied to find probable cause.  (See *Walker*, *supra*, 12 Cal.5th at p. 209.)

DISPOSTION

The petition is granted.  The matter is remanded to the superior court with instructions to conduct a new probable cause hearing consistent with this opinion.

HUFFMAN, Acting P. J.

WE CONCUR:


AARON, J.


IRION, J.